[No. 26269. *En Banc.* September 15, 1936.]

ADOLPH J. JOHNSON, *Respondent,* v. THE STATE OF WASHINGTON *et al., Appellants,* PETROLEUM NAVIGATION COMPANY, *Respondent.*[1]

*The Attorney General, Harry L. Parr,* and *Geo. G. Hannan, Assistants* (*Charles R. Lewis,* of counsel), for appellants.

*Allen, Froude & Hilen* and *Eli E. Dorsey,* for respondents.

*J. Charles Dennis, Thomas H. Eliot, K. I. Ghormley, Stratton, Leader, Little & Stratton, Grosscup, Morrow & Ambler, Bogle, Bogle & Gates, Battle, Hulbert, Helsell & Bettens,* and *Velikanje & Velikanje, amici curiae.*

BEALS, J.—Plaintiff instituted this action under chapter 113, Laws of 1935, p. 305 (Rem. 1935 Sup., §§ 784-1 to 784-15 [P. C. §§ 8108-21 to 8108-35]), which may be designated as the declaratory judgment act.

[1]Reported in 60 P. (2d) 681.

The purpose of the action was to restrain the enforcement of chapter 145, Laws of 1935, p. 438 (Rem. 1935 Sup., §§ 7796-1a to 7796-24 [P. C. §§ 3546-31 to 3546-54]), known as the unemployment compensation act. Plaintiff named as defendants the state of Washington, Otto A. Case, its treasurer, and Petroleum Navigation Company, a corporation, plaintiff's employer.

In his amended complaint, plaintiff alleged facts which he contended entitled him to a decree enjoining the enforcement of the act and restraining his employer from withholding from his wages any sums whatsoever as contributions under the provisions of the unemployment compensation act. Defendant Petroleum Navigation Company cross-complained, alleging the unconstitutionality of the act and praying for the entry of a declaratory judgment declaring the same void. The state demurred to the complaint and also to the cross-complaint, upon the ground, among others, that the pleadings failed to state facts sufficient to constitute a cause of action, and upon the overruling of these demurrers, elected to stand thereon and declined to plead further. The court thereupon entered a decree declaring the unemployment compensation act unconstitutional and void, and restraining defendant Petroleum Navigation Company from withholding from plaintiff's wages any sum whatsoever as a contribution from plaintiff under the act. From this decree, the state of Washington and Otto A. Case, as its treasurer, have appealed.

No question of the constitutionality of the declaratory judgment act of this state above referred to is raised in this case, and, in view of the importance of the questions presented, we assume, without deciding, that the act is a valid expression of the legislative will.

The unemployment compensation act above referred

to initially passed the state senate March 8, and the house March 12, 1935, and after some amendments was formally enacted by the legislature, and was approved by the governor March 21st. Section 24, p. 471, of the act reads as follows:

"This act is to become operative in the State of Washington from and after the enactment date of the Wagner-Doughton bill which is now before the congress of the United States." (Rem. 1935 Sup., § 7796-24 [P. C. § 3546-54]).

In view of this section, it becomes necessary to consider the Federal legislation referred to therein.

January 17, 1935, there was introduced in both houses of the Congress a bill, designated by its terms as the "economic security act," which bill has been referred to as the Wagner-Doughton bill, and sometimes as the Wagner-Lewis-Doughton bill; Senator Wagner having introduced it in the Senate, and Congressmen Doughton and Lewis in the House. It is admitted by the pleadings herein that this act, as such, was never passed by the Congress of the United States, and it follows that there has never been an "enactment date of the Wagner-Doughton bill," as referred to in § 24, p. 471, *supra,* of the act here in question. There was, however, introduced in the House, April 4, 1935, several weeks after the enactment of chapter 145, .p. 438, and after the adjournment of the legislature, a bill known as the "social security act," embracing the basic principles of the Wagner-Doughton bill, which act was passed by the Congress and approved by the President August 14, 1935.

The first question to be determined herein is, consequently, whether it can be held that the legislature of this state, by referring to a specific bill which was then before the Congress, and having expressly fixed the enactment date of that bill as the operative

date of the state act, intended to refer to another bill which was not then in existence, the provisions of which in many particulars differ from those of the bill referred to in the enactment clause of the state act. It should be observed that the history of the state legislation clearly indicates that it was not the intention of the legislature that the statute which it enacted should become effective irrespective of whether or not any Federal legislation along the same lines was enacted.

For the purposes of this case, we assume, without deciding, that a state legislature may provide that a statutory enactment shall become operative upon the enactment date of a Federal statute not yet passed by the Congress. It is clear, however, that such a provision as that contained in § 24, p. 471, *supra,* which refers specifically to a particular act then pending before the Congress, cannot be greatly extended by judicial interpretation, as, by referring to a particular pending bill instead of to a general legislative plan, the state legislature manifestly had in mind the terms of the act to which it referred—a matter which might conceivably become of great importance, and one upon which the legislative intent might well depend. Such a provision is vague at best, and if too liberally construed might place the state legislature in a position of attempting to abrogate its constitutional legislative functions.

Assuming, as above stated, however, that such a provision is valid, courts must have regard to substance rather than form, and if the act finally adopted by the Congress be found practically identical with the Wagner-Doughton bill, it should be held that the difference in designation is not material.

A copy of the Wagner-Doughton bill is attached to the amended complaint as an exhibit. The social security act is, of course, available in 49 Stat. 620, 42

U. S. C. A., § 301, *et seq.* (The Wagner-Doughton bill will hereinafter be referred to as the "bill," and the social security act as the "act.") The bill and the act differ in important particulars.

The tax rates of the bill and act may vary materially during the first two years of operation. The act imposes a flat one per cent rate for 1936 and two per cent for 1937, while the rates under the bill for the same two years were to be determined by the Federal Reserve Board's adjusted index of total industrial production averages, using the years 1923-25 as a base, not, however, to exceed three per cent.

The bill applies only to employers having four or more employees within each of thirteen or more calendar weeks in the taxable year, while the act applies to persons employing eight or more at least twenty days, each day being in a different week during the calendar year.

Referring to the tax for unemployment insurance, the bill embraces all employment save such as falls within any unemployment compensation system established by act of Congress, whereas the act excepts from the term "employment" four different classes, including such important and numerous classes as (1) agricultural labor, and (2) domestic service in a private home.

According to the confused provisions of the bill, an allowable credit seems to be based upon the contributions made during the taxable quarter to a state unemployment fund, while the corresponding provisions of the act contain different language. The provisions of the act allowing for additional credits differ materially from the corresponding provisions contained in the bill.

The act of our legislature adopts from the bill ver-

batim the method of determining the rate of tax for the first two years of operation. This suggests the possibility that the rate to be levied by the state may be greater than that levied under the Federal act. It was probably to avoid this danger that the state legislature made the operative date of the act dependent upon the enactment of the Wagner-Doughton bill; that is, a higher tax on Washington employers places the state of Washington at a competitive disadvantage with other industrial states. Manifestly, to avoid this evil was the primary reason for the adoption of a national plan of unemployment insurance.

It must, of course, be recognized that the state legislature knew that the bill, as pending legislation, might in some particulars be amended prior to its final enactment into law. At the same time, it must be held that the legislature, in making the operative date of its act dependent upon the enactment by the Congress of a specific bill then pending, enacted the statute in contemplation of the terms of the particular bill to which it referred, irrespective indeed of its name or designation, but in view of the provisions of the bill which the legislature had before it for study and consideration. The legislature did not choose to make the operative date of its act dependent upon the enactment by the Congress of some social security or unemployment insurance legislation, but for good and sufficient reasons made the act which they passed dependent for its effectiveness upon the enactment by the Congress of a certain bill then pending before the Congress. The legislature, then, acted in contemplation of a particular piece of Federal legislation which it seemed probable would be passed by the Congress; and if the act finally passed by the Congress differs materially from that upon which the state legislature based its action, it

must be held that the state statute has never become operative.

It is impossible to pronounce any formula by which all similar questions can be decided. It would, doubtless, be agreed that some immaterial amendment to the bill would be held unimportant, and, on the other hand, that some essential departure from the terms of the proposed legislation upon which the state legislature based its action would prevent the state act from becoming effective. Between the two extremes lies much room for difference of opinion, but it must always be remembered that the underwriting of legislation to be enacted in the future is dangerous, and that a state legislature in particular must be held to the exercise of its important functions upon knowledge of existing facts and not upon expectations. If, as clearly shown by the act in question, the state legislature intended that its act should become operative only upon the enactment by the Congress of a particular bill, in our opinion it cannot be held that the state act became operative upon the enactment by the Congress of a statute differing in important and material particulars from the bill which the legislature had in contemplation.

In two respects, the difference between the bill and the act is marked: First, in the application of the bill to practically all employment, and the many important exclusions from the term "employment," set up by the act; and second, in the method of fixing the assessment rate for the first two years. Other differences exist, some of which are above noted, and the legislative act, having manifestly been patterned upon the bill, is in some respects not in harmony with the Federal act as finally passed. It is interesting to note that, as shown by the Congressional Record, one of

the sponsors of the bill said, in the course of debate on the act:

"The proposed bill (referring to the act) has been entirely rewritten, and important modifications have been made at many points." 74 Congress, 1st Ses., 79 Congressional Record 5467.

After careful consideration of the case, we hold that, in view of the legislation as finally enacted by the Congress, chapter 145, Laws of 1935, p. 438, never became operative, and that, for the reasons herein stated, the superior court rightly enjoined the state authorities from putting the state law into operation.

Many other questions are argued in the briefs which have been filed in this case, including that of the constitutionality of the Federal social security act, but the view which we take of the question which we have discussed renders consideration of such questions unnecessary.

Decree affirmed.

MAIN, STEINERT, MITCHELL, and HOLCOMB, JJ., concur.

BLAKE, J. (dissenting)—After waiting for four years or more for the return of prosperity and in the meantime experimenting with various forms of relief, the Congress recognized the fact that, under our economic system, there would always be certain classes of our citizens who would require financial aid in order to live. Recognition of the fact took form in a bill the short title of which was: "The economic security act," but it was popularly known as the "Wagner-Doughton bill." Its scope was comprehended in the title:

"To alleviate the hazards of old age, unemployment, illness, and dependency, to establish a Social Insurance Board in the Department of Labor, to raise revenue, and for other purposes."

The bill comprised a comprehensive program, under separate Titles, for relief, in the following respects: (1) To persons not less than sixty-five years of age; (2) dependent children; (3) unemployed persons; (4) for maternal and child health, for the care of crippled children; and for aid to child-welfare services. Under each title, there was provided a present appropriation, and provision made for annual appropriations thereafter to carry out the purposes of the bill. In each title, conditions were prescribed upon compliance with which the various states might participate in the appropriations made under such title. With respect to state participation in appropriations for the unemployed, the bill provided:

"The Board shall periodically make allotments, in a total amount of not more than $4,000,000 in the fiscal year ending June 30, 1936, and thereafter not more than $49,000,000 in each year, to those States which have unemployment compensation laws requiring contributions for which credits against tax are allowed, under Title VI of this Act."

Title VI provided for an excise tax of three per cent of the employer's annual payroll, with provision for a lesser per cent under certain specified conditions. Of this tax, the employer was entitled to credit ninety per cent against the amount of his contributions to any unemployment fund under any state law.

At the time the Wagner-Doughton bill was introduced in Congress, our legislature was in session. Desiring to cooperate with the Federal government and to participate in the unemployment program outlined in the Wagner-Doughton bill, the legislature passed chapter 145, Laws 1935, p. 438 (Rem. 1935 Sup., §§ 7796-1a to 7796-24 [P. C. §§ 3546-31 to 3546-54]). This act constitutes a comprehensive plan for unemployment compensation. It has as its foundation the

Wagner-Doughton bill, and is designed in all respects to coordinate with the plan of unemployment compensation as outlined in that bill. It is provided that the act shall become effective ''from and after the enactment of the Wagner-Doughton bill which is now before the congress of the United States.''

But the Wagner-Doughton bill as such was never enacted by Congress. Now, is this fortuitous circumstance to be permitted to thwart the most important piece of social legislation that has ever been enacted by the Congress of the United States and the state legislature? For an answer to the question, we must ascertain the legislative intent. To ascertain that intent, we must look to the declaration of the legislature in the act itself and to the ''social security act'' which the Congress enacted as a substitute for the Wagner-Doughton bill.

A comparison of the latter with the former reveals a change in form, but not in substance. Every essential feature of the Wagner-Doughton bill is carried into the social security act. The classes of persons for whom provision is made are the same. The method provided for state cooperation and participation is the same. The ninety per cent credit feature in the excise tax is carried into the social security act.

As I compare the act with the Wagner-Doughton bill, the only striking difference I can find is in structural form. It is true there are differences, but these relate almost wholly to administrative features. But even these are fundamentally the same. In fact, the social security act is, to all intents and purposes, the Wagner-Doughton bill (''the economic security act'').

The difference in the two bills with respect to the excise tax is this. Under the Wagner-Doughton bill, a maximum excise of three per cent is levied against all employers, as by the act defined. For the years

1936 and 1937, this might be reduced to one per cent and two per cent, respectively, as the Federal Reserve index indicated. Under the "social security act," the excise provision applies only to employers of eight or more persons. The maximum rate is three per cent, and the rate for 1936-1937 is fixed definitely at one per cent and two per cent, respectively. Whatever difference there is between these provisions of the two bills is in favor of the taxpayer. It must be conceded, as pointed out in the majority opinion, that the rate of tax on wages and payroll is slightly higher in the "social security act" than in the Wagner-Doughton bill. The maximum rate on wages in the Wagner-Doughton bill was two and one-quarter per cent as against three per cent in the "social security act." The maximum rate (on payroll) under the Wagner-Doughton bill was two and one-half per cent as against three per cent under the "social security act."

To say that these slight differences between the two acts are sufficient to hold that the legislative intent did not comprehend the social security act, as finally enacted, is to charge the legislature with making a fetish of a name and indulging in a futility when it passed chapter 145, p. 438. For none knew better than the legislators themselves what transformations and revisions pending legislation must go through before it becomes law. When they passed chapter 145, p. 438, they were concerned with a great social program, as exemplified by the Wagner-Doughton bill. The name by which it went was of small consequence. The fact that, to all intents and purposes, it became law (although under another name) is all that matters. And we need not go beyond chapter 145, p. 438, itself to learn that that was all with which the legislature was concerned when it provided that the act should become operative "from and after the enactment date of the

Wagner-Doughton bill." For the legislature declared its purpose in the preamble in no uncertain terms:

"Whereas, economic insecurity due to unemployment is a serious menace to the health, morals and welfare of the people of this state; involuntary unemployment is, therefore, a subject of general interest and concern which requires appropriate action by the legislature to prevent its spread and to lighten its burden which now so often falls with crushing force upon the unemployed worker and his family. Social security requires protection against this greatest hazard of our economic life. This can be provided only by application of the insurance principle of sharing the risks, and by the systematic accumulation of funds during periods of employment to provide benefits for periods of unemployment, thus limiting the serious social consequences of poor relief assistance. The state of Washington, therefore, exercising herein its police and sovereign power endeavors by this act to remedy the widespread unemployment situation which now exists and to set up safeguards to prevent its reoccurrence in the years to come. The legislature hereby declares that in its considered judgment the public good and the general welfare of the workers of the state require the enactment of this measure, for the compulsory setting aside of unemployment reserves to be used for the benefit of persons unemployed through no fault of their own, *and that this act shall be liberally construed for the purpose of reducing involuntary unemployment and the suffering caused thereby to the minimum.*" (Italics mine.) Laws of 1935, chapter 145, p. 438, § 2 (Rem. 1935 Sup., § 7796-2a [P. C. § 3546-32]).

I dissent.

MILLARD, C. J., and TOLMAN, J., concur with BLAKE, J.

GERAGHTY, J. (dissenting)—It is to be regretted that this case is disposed of on the technical ground sustaining the majority opinion. I should like to have seen the court decide the constitutional issues involved in the act.

While, admittedly, the provision in the act fixing its effective date is poorly drawn, as I see it, there can be no doubt that the legislature intended the act to dovetail into legislation of similar import then under consideration by Congress. The reference to the Wagner-Doughton bill was descriptive of type, rather than specific detail. There can be no doubt that, in its broad aspects, the congressional act ultimately passed conformed to the plan of the so-called Wagner-Doughton bill.

For this reason, I am dissenting from the majority opinion.