# ILLINOIS OFFICIAL REPORTS

## Supreme Court

---

### *Wirtz v. Quinn*, 2011 IL 111903

---

| | |
|---|---|
| Caption in Supreme Court: | W. ROCKWELL WIRTZ *et al.*, Appellees, v. PATRICK QUINN, Governor, *et al.*, Appellants. |
| Docket No. | 111903 |
| Filed | July 11, 2011 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | Video Gaming Act held not to violate the single-subject provision of the Illinois Constitution of 1970. |
| Decision Under Review | Appeal from the Appellate Court for the First District, reported at 407 Ill. App. 3d 776; heard in that court on appeal from the Circuit Court of Cook County, the Hon. Lawrence O'Gara, Judge, presiding. |
| Judgment | Appellate court judgment reversed; circuit court judgment affirmed. |

Counsel on
Appeal

Lisa Madigan, Attorney General, of Springfield (Michael A. Scodro, Solicitor General, and Richard S. Huszagh, Assistant Attorney General, of Chicago, of counsel), for appellants.

Sam Vinson, Floyd D. Perkins, Claudette P. Miller, Seth A. Horvath and Patrick J. Hanlon, of Ungaretti & Harris LLP, of Chicago, for appellees.

Marc R. Poulos, Kara M. Principe and Melissa L. Binetti, of Countryside, for *amicus curiae* Indiana, Illinois, Iowa Foundation for Fair Contracting.

Justices

JUSTICE BURKE delivered the judgment of the court, with opinion.

Chief Justice Kilbride and Justices Freeman, Thomas, Garman, Karmeier, and Theis concurred in the judgment and opinion.

**OPINION**

¶ 1    In this appeal, plaintiffs challenge the constitutionality of four public acts, Public Acts 96–34, 96–35, 96–37, and 96–38 (eff. July 13, 2009). The public acts at issue, comprising three substantive bills and one appropriation bill, were enacted as part of a "capital projects" plan and were signed into law by Governor Patrick Quinn on July 13, 2009.

¶ 2    The appellate court held that Public Act 96–34 violates the single subject clause of the Illinois Constitution of 1970 (Ill. Const. 1970, art. IV, § 8(d)), and that the three remaining public acts were invalid based on language making their enactment contingent on the enactment of Public Act 96–34. 407 Ill. App. 3d 776.

¶ 3    For the reasons that follow, we reverse the judgment of the appellate court.

¶ 4    BACKGROUND

¶ 5    On August 25, 2009, plaintiffs, W. Rockwell Wirtz, on behalf of all taxpayers situated in the State of Illinois, and Wirtz Beverage Illinois, LLC, filed a petition pursuant to section 11–303 of the Code of Civil Procedure (735 ILCS 5/11–303 (West 2008)) in the circuit court of Cook County for leave to file their verified complaint seeking to restrain and enjoin the disbursement of public funds by the defendant public officials. In their complaint, plaintiffs alleged that Public Acts 96–34, 96–35, 96–37, and 96–38 violated various provisions of the Illinois Constitution, including the single subject clause (Ill. Const. 1970, art. IV, § 8(d)); the presentment clause (Ill. Const. 1970, art. IV, § 9(a)); the effective-date-of-laws clause (Ill. Const. 1970, art. IV, § 10); veto procedures (Ill. Const. 1970, art. IV, §§ 9(b), (d), (e)); the

-2-

separation of powers doctrine (Ill. Const. 1970, art. II, § 1); the public-funds-for-public-purposes clause (Ill. Const. 1970, art. VIII, § 1(a)); the uniformity clause (Ill. Const. 1970, art. IX, § 2); and the limitation on the subject of appropriation bills (Ill. Const. 1970, art. IV, § 8(d)).

¶ 6     On October 20, 2009, the circuit court denied plaintiffs' petition. The court held that all of plaintiffs' claims failed as a matter of law and, therefore, there was no "reasonable ground," under section 11–303 of the Code of Civil Procedure, for allowing plaintiffs' complaint to go forward.[1] The circuit court denied plaintiffs' motion for reconsideration.

¶ 7     The appellate court reversed. 407 Ill. App. 3d 776. The court held that Public Act 96–34 violates the single subject clause of the Illinois Constitution (Ill. Const. 1970, art. IV, § 8(d)), because the provisions in the Act do not have a natural and logical connection to the single subject of revenue. Accordingly, the court concluded that Public Act 96–34 was void in its entirety. The court also held that Public Acts 96–35, 96–37, and 96–38 could not stand because they were expressly contingent on the enactment of Public Act 96–34. The court did not address the remaining constitutional issues raised by plaintiffs.

¶ 8     Defendants petitioned this court for leave to appeal as of right under Supreme Court Rule 317 (Ill. S. Ct. R. 317 (eff. July 1, 2006)) or, alternatively, as a matter of discretion under Rule 315 (Ill. S. Ct. R. 315(a) (eff. Feb. 26, 2010)). This court granted defendants' petition for leave to appeal. We also granted leave to the Indiana, Illinois, Iowa Foundation for Fair Contracting to submit an *amicus curiae* brief in support of defendants.

¶ 9     For the reasons that follow, we reverse the judgment of the appellate court. In the interest of judicial economy, rather than remand the cause to the appellate court, we also address and reject the remaining claims raised in plaintiffs' complaint. Accordingly, we affirm the judgment of the circuit court.

¶ 10                            ANALYSIS
¶ 11                      I. Single Subject Clause
¶ 12     The single subject clause of the Illinois Constitution provides, in relevant part: "Bills, except bills for appropriations and for the codification, revision or rearrangement of laws, shall be confined to one subject." Ill. Const. 1970, art. IV, § 8(d).

¶ 13     The single subject rule regulates the process by which legislation is enacted, by prohibiting a legislative enactment from "clearly embracing more than one subject on its face." *Arangold Corp. v. Zehnder*, 187 Ill. 2d 341, 351 (1999); *People v. Olender*, 222 Ill. 2d 123, 131 (2005). One purpose of the single subject requirement is to preclude the passage of legislation which, standing alone, would not receive the necessary votes for enactment.

_____

[1]We note that in the appellate court, plaintiffs argued that, under the "reasonable ground" standard of section 11–303, the circuit court was limited to determining whether their complaint was "frivolous or malicious" (*Strat-O-Seal Manufacturing Co. v. Scott*, 27 Ill. 2d 563, 566 (1963)) and that, at this juncture, the court could not go beyond that determination and resolve their complaint on the merits. Plaintiffs do not pursue this argument here.

*Olender*, 222 Ill. 2d at 132; *People v. Cervantes*, 189 Ill. 2d 80, 83 (1999). This disfavored practice is known as "logrolling," or "bundling unpopular legislation with more palatable bills, so that the well-received bills would carry the unpopular ones to passage." *People v. Wooters*, 188 Ill. 2d 500, 518 (1999). Thus, the single subject rule "ensures that the legislature addresses the difficult decisions it faces directly and subject to public scrutiny, rather than passing unpopular measures on the backs of popular ones." *Johnson v. Edgar*, 176 Ill. 2d 499, 515 (1997). Another reason for the single subject rule is to promote an orderly legislative process. *Wooters*, 188 Ill. 2d at 518. " 'By limiting each bill to a single subject, the issues presented by each bill can be better grasped and more intelligently discussed.' " *Johnson*, 176 Ill. 2d at 514-15 (quoting Millard H. Ruud, *No Law Shall Embrace More Than One Subject*, 42 Minn. L. Rev. 389, 391 (1958)).

¶ 14    In determining whether a particular enactment violates the single subject rule, we construe the word "subject" liberally in favor of upholding the legislation. *Olender*, 222 Ill. 2d at 132; *Arangold*, 187 Ill. 2d at 352. The subject may be as broad as the legislature chooses. *People v. Boclair*, 202 Ill. 2d 89, 109 (2002); *Johnson*, 176 Ill. 2d at 515. However, "while the legislature is free to choose subjects comprehensive in scope, the single subject requirement may not be circumvented by selecting a topic so broad that the rule is evaded as 'a meaningful constitutional check on the legislature's actions.' " *Boclair*, 202 Ill. 2d at 109 (quoting *Johnson*, 176 Ill. 2d at 515-18).

¶ 15    Neither the length of an act nor the number of provisions in an act is determinative of its compliance with the single subject rule. *Arangold*, 187 Ill. 2d at 352; *Cutinello v. Whitley*, 161 Ill. 2d 409, 423 (1994). What is dispositive is whether the provisions in the act have a "natural and logical connection" to the single subject. *Boclair*, 202 Ill. 2d at 109; *Arangold*, 187 Ill. 2d at 352. Thus, a piece of legislation violates the single subject rule when it contains unrelated provisions that by no fair interpretation have any legitimate relation to the single subject. *Arangold*, 187 Ill. 2d at 352.

¶ 16                              A. *Public Act 96–34*

¶ 17    In count I of their complaint, plaintiffs allege that Public Act 96–34 violates the single subject clause. Legislative enactments are presumed to be constitutional (*Wooters*, 188 Ill. 2d at 505; *People v. Reedy*, 186 Ill. 2d 1, 9 (1999)), and a party challenging the constitutionality of a statute bears the burden of clearly establishing a constitutional violation (*People v. Dabbs*, 239 Ill. 2d 277, 291 (2010)). The appellate court's finding that a statute is unconstitutional is reviewed *de novo*. *People v. Burdunice*, 211 Ill. 2d 264, 267 (2004); *People v. Sypien*, 198 Ill. 2d 334, 338 (2001).

¶ 18    Public Act 96–34, entitled, "An Act concerning revenue," contains the following provisions.

¶ 19    Article 5 creates the Video Gaming Act. This legislation allows certain licensed establishments, including establishments where alcoholic liquor is served for consumption, fraternal establishments, veterans establishments, and truck stops, to conduct video gaming. Article 5 sets forth rules for obtaining licenses and requirements for video game terminals. It provides that the Illinois Gaming Board is responsible for testing and approving every

-4-

licensed video game terminal. The article imposes a tax of 30% on all net income from video gaming terminals. Of the taxes collected, five-sixths shall be deposited into the Capital Projects Fund and one-sixth shall be deposited into the Local Governmental Video Gaming Distributive Fund.

¶ 20    Article 800 creates the Capital Spending Accountability Law. This law requires the Governor's Office of Management and Budget to provide quarterly reports on the status of all capital projects in the state to the Comptroller, the Treasurer, the President and Minority Leader of the Senate, and the Speaker and Minority Leader of the House of Representatives.

¶ 21    Article 900, section 900, amends the Illinois Lottery Law (20 ILCS 1605/1 *et seq.* (West 2008)) to provide that the Department of Revenue will conduct the lottery with the assistance of a private manager under a management agreement overseen by the Department. Section 900 also creates a pilot program allowing individuals to purchase lottery tickets on the internet. The pilot program must be conducted pursuant to a contract with a private vendor. Finally, section 900 requires that lottery proceeds be transferred monthly to the Common School Fund in an amount equal to the corresponding month in 2009, adjusted for inflation, and that any remaining proceeds be deposited yearly into the Capital Projects Fund.

¶ 22    Section 905 amends the State Finance Act (30 ILCS 105/1.1 *et seq.* (West 2008)) to create the Capital Projects Fund as a special fund in the State Treasury. It provides that, subject to appropriation, the Capital Projects Fund may be used only for capital projects and the payment of debt service on bonds issued for capital projects. Section 905 also requires certain transfers of money from the Capital Projects Fund to the General Revenue Fund, and it provides that, beginning in fiscal year 2010, no road fund moneys shall be appropriated to the Department of State Police or to the Secretary of State.

¶ 23    Sections 910, 915, 920, and 925 amend the Use Tax Act (35 ILCS 105/1 *et seq.* (West 2008)), the Service Use Tax Act (35 ILCS 110/1 *et seq.* (West 2008)), the Service Occupation Tax Act (35 ILCS 115/1 *et seq.* (West 2008)), and the Retailers' Occupation Tax Act (35 ILCS 120/1 *et seq.* (West 2008)), respectively. These sections raise the tax rate on the sale of candy, soft drinks, and grooming and hygiene products from 1% to 6.25%. Under these amendments, the Department of Revenue must make monthly deposits into the Capital Projects Fund, in amounts estimated to be 80% of the net revenue for the preceding month realized from the sales of the above products.

¶ 24    Section 930 amends the Motor Fuel Tax Law (35 ILCS 505/1 *et seq.* (West 2008)) to increase the amount of money to be transferred from the Motor Fuel Tax Fund to the Grade Crossing Protection Fund.

¶ 25    Section 935 amends the University of Illinois Act (110 ILCS 305/0.01 *et seq.* (West 2008)), adding a new section requiring the University of Illinois at Urbana-Champaign to conduct a study on the effect on Illinois families of purchasing lottery tickets. The section provides that the university shall report its findings to the General Assembly on or before January 1, 2011 (110 ILCS 305/12.5 (West 2010)).

¶ 26    Section 940 amends the Riverboat Gambling Act (230 ILCS 10/1 *et seq.* (West 2008)), allocating responsibility for administration and enforcement of the Video Gaming Act to the Illinois Gaming Board.

¶ 27        Section 945 amends the Liquor Control Act of 1934 (235 ILCS 5/1–1 *et seq.* (West 2008)), increasing the taxes on manufacturers and importing distributors of beer, wine and spirits. All of the proceeds of the additional taxes shall be deposited into the Capital Projects Fund.

¶ 28        Section 950 amends the Environmental Protection Act (415 ILCS 5/1 *et seq.* (West 2008)) to provide that, with one exception, "the Underground Storage Tank Fund is not subject to administrative charges authorized under Section 8h of the State Finance Act [30 ILCS 105/8h (West 2008)] that would in any way transfer any funds from the Underground Storage Tank Fund into any other fund of the State."

¶ 29        Section 955 amends the Illinois Vehicle Code (625 ILCS 5/1–100 *et seq.* (West 2008)), increasing various motor vehicle fees and requiring that the proceeds of the increased fees be deposited into the Capital Projects Fund. Section 955 also increases certain weight limits for vehicles and loads and, at the same time, increases fines for overweight vehicles. The proceeds of the additional fines are to be deposited into the Capital Projects Fund.

¶ 30        Section 960 amends the Criminal Code of 1961 (720 ILCS 5/28–1 *et seq.* (West 2008)) to provide that the criminal offenses of gambling and syndicated gambling do not include the manufacture, distribution, or possession of video gaming terminals by licensed individuals; lotteries conducted by a third party pursuant to a management agreement with the state; or the purchase of lottery tickets through the internet under the program established in section 7.12 of the Illinois Lottery Law.

¶ 31        Finally, article 9999, section 9999, of Public Act 96–34 provides: "This Act takes effect July 1, 2009, except that the changes to ***the Illinois Vehicle Code take effect January 1, 2010; but this Act does not take effect at all unless House Bill 312 of the 96th General Assembly [enacted as Public Act 96–35], as amended, becomes law."

¶ 32        The appellate court held that the single subject of Public Act 96–34 was revenue, based on its official title, "An Act concerning revenue." However, defendants assert before this court that the single subject of Public Act 96–34 is capital projects. Defendants are not limited solely to the contents of the title of an act in offering a single subject rationale. *Boclair*, 202 Ill. 2d at 109-10; see also *Olender*, 222 Ill. 2d at 140. Moreover, capital projects is a legitimate single subject, one which is not "so broad that the rule is evaded as 'a meaningful constitutional check on the legislature's actions.' " *Boclair*, 202 Ill. 2d at 109 (citing *Johnson*, 176 Ill. 2d at 515-18).

¶ 33        Having determined that the subject of capital projects is legitimate, we must examine the provisions in Public Act 96–34 to discern whether they have a "natural and logical connection" to that subject. *Sypien*, 198 Ill. 2d at 338-39. In doing so, we find that the substantive provisions in Public Act 96–34 clearly are connected to capital projects in that they establish increased revenue sources to be deposited into the Capital Projects Fund. The few provisions that do not directly raise revenue are still related to the overall subject of the Act in that they help to implement the other provisions. " 'An act may include all matters germane to a general subject, including the means reasonably necessary or appropriate to the accomplishment of the legislative purpose.' " *People ex rel. Ogilvie v. Lewis*, 49 Ill. 2d 476, 487 (1971) (quoting *People ex rel. Gutknecht v. City of Chicago*, 414 Ill. 600, 607-08

(1953)).

¶ 34 For example, the provision in article 900, section 935, of Public Act 96–34, which authorizes a study on the effect of the lottery on Illinois families, is related to the amendments to the Illinois Lottery Law in article 900, including the establishment of a pilot program to purchase lottery tickets on the internet. The legislature reasonably anticipated that the amendments would result in additional sales of lottery tickets, with the extra proceeds to be deposited into the Capital Projects Fund. Therefore, a study on the effect of greater numbers of people buying lottery tickets is related to the implementation of these changes. Similarly, the amendments to the Illinois Vehicle Code in article 900, section 955, increasing certain vehicle weight limits, while not related to revenue, are related to the provisions increasing the fines for violations of these limits. Although the weight limits are increased, the amounts of most of the fines are doubled, which the legislature evidently believed would result in a net increase of revenue to be deposited into the Capital Projects Fund.

¶ 35 According to plaintiffs, even assuming that the single subject of Public Act 96–34 is capital projects, several provisions in the Act bear no relation to that subject because they have the effect of allocating money to the General Revenue Fund rather than to the Capital Projects Fund. We do not find plaintiffs' argument persuasive.

¶ 36 First, plaintiffs allege that a portion of the tax revenue raised from the increased taxes on soft drinks, candy, and grooming and hygiene products is directed to the Common School Fund and the General Revenue Fund. Defendants respond that the recategorization of these products from the 1% tax rate to the 6.25% rate results in 5% of the revenue generated by the increased rate going to the Capital Projects Fund, 1% going to the Local Government Fund, and 0.25% going to the County and Mass Transit District Fund, with no money going to the General Revenue Fund. Defendants allege that this allocation was necessary because "doing anything else with the additional 0.25% would have required a massive overhaul of the current structure for processing the relevant sales and collecting the corresponding taxes."

¶ 37 Secondly, plaintiffs point to article 900, section 905, of the Act, which authorizes transfers of certain amounts of money from the Capital Projects Fund to the General Revenue Fund, and also provides that, beginning in fiscal year 2010, no road fund moneys shall be appropriated to the Department of State Police and to the Secretary of State. Plaintiffs argue that the amounts to be transferred to the General Revenue Fund are much greater than, and not offset by, the elimination of road fund diversions to pay for operations of the State Police and Secretary of State. Defendants dispute the figures cited by the plaintiffs and allege that the amounts of money are comparable.

¶ 38 Whether or not the plaintiffs are correct about the percentages going to the Capital Projects Fund, it is not the function of this court to trace the origin and destination of every dollar amount cited in Public Act 96–34. Rather, our task is to decide whether Public Act 96–34, as a whole, is devoted to a single subject and, therefore, constitutional. In doing so, we bear in mind that the single subject rule is construed liberally and "is not intended to handicap the legislature by requiring it to make unnecessarily restrictive laws." *Cutinello v. Whitley*, 161 Ill. 2d 409, 423 (1994). Applying that principle here, we see no provision in the Act which stands out as being constitutionally unrelated to the single subject of capital

projects.

¶ 39    We note, also, that previous decisions of this court which have struck down legislation for violating the single subject rule are distinguishable. In *People v. Olender*, 222 Ill. 2d 123, 139 (2005), a bill in its original form amended three criminal statutes: the Cannabis and Controlled Substances Tax Act (35 ILCS 520/14.1 (West 1994)), a provision in the Criminal Code of 1961 dealing with the seizure and forfeiture of vehicles (720 ILCS 5/36–1 (West 1994)), and a provision in the Unified Code of Corrections concerning reimbursement of expenses by convicted persons to the Department of Corrections (730 ILCS 5/3–7–6, 3–12–5, 5–8–1 (West 1994)). Following the addition of eight amendments, the bill created two new statutes while amending numerous provisions in 24 other statutes, including several tax acts, the Downstate Forest Preserve District Act (70 ILCS 805/18.6d (West 1994)), the Charitable Games Act (230 ILCS 30/2, 4, 5 (West 1994)), and the Communicable Disease Prevention Act (410 ILCS 315/2c (West 1994)). We rejected the State's arguments that the various provisions fit within the broad categories of either "governmental regulation" or "revenue." *Olender*, 222 Ill. 2d at 140-42. There was no natural and logical connection between the multiple provisions in the bill and either of those subjects. We held that "[t]o sanction such a strained connection between this statute and the subject of revenue to the State and its subdivisions would render the single subject clause a nullity." *Id.* at 142.

¶ 40    In another case, *People v. Reedy*, 186 Ill. 2d 1 (1999), the bill initially addressed the single subject of the criminal insanity defense but eventually dealt with as many as five separate legislative topics, involving both civil and criminal matters. Those topics included the basic duties and jurisdiction of law enforcement officials; the burden of proof for a criminal defendant asserting the insanity defense; civil and criminal rules governing drug offense and drug asset forfeiture proceedings; truth-in-sentencing law; and rules for hospital liens. Even when giving great deference to the legislature, we held that the contents of the bill encompassed at least two unrelated subjects: matters relating to the criminal justice system and matters relating to hospital liens. *Id.* at 12. The State's argument that each of the provisions fit within the category of "governmental matters" was not compelling. *Id.* at 12.

¶ 41    Finally, in *Johnson v. Edgar*, 176 Ill. 2d 499, 517 (1997), the enactment was held to be an "egregious example of the legislature ignoring the single subject rule." What started as an 8-page bill became a 200-page bill, encompassing such diverse topics as child sex offenders, employer eavesdropping, and environmental impact fees imposed on the sale of fuel. Rejecting the State's suggestion that the subject of the bill was "public safety," we held, "[w]ere we to conclude that the many obviously discordant provisions *** are nonetheless related because of a tortured connection to a vague notion of public safety, we would be essentially eliminating the single subject rule as a meaningful constitutional check on the legislature's actions." *Id.* at 517-18.

¶ 42    In contrast to the cases described above, there are no "smoking gun" provisions in Public Act 96–34 which clearly violate the intent and purpose of the single subject rule. On the Act's face, all of the provisions have a natural and logical connection to the single subject of capital projects.

¶ 43    Furthermore, a review of the extensive legislative debate preceding the enactment of

Public Act 96–34 supports our conclusion that the Act does not violate the single subject clause. Given that the single subject rule is intended to "regulate[ ] the process by which legislation is enacted" (*Olender*, 222 Ill. 2d at 131), it is useful to examine the legislative debates conducted by the General Assembly. The following comments are representative of many of the legislators' remarks. Senator Cullerton, for example, stated:

"It's been ten years since we've had a capital bill. The toughest part is coming up with the money. *** It's not easy voting for these taxes. Quite frankly, there's parts in here that I would prefer not be here, would–that would be substituted with other parts. But it's–when you work with different parties, different–the House and Senate, you need to have compromise. And that's what this is. *** We have measures here dealing with video gaming and the Lottery. We have sales tax–streamlined sales tax language that would generate more money by coming in conformity with the streamlined sales tax. There are liquor taxes, and also vehicle-related tax increases that are very similar to the ones that we did ten years ago when we had a successful capital bill." 96th Ill. Gen. Assem., Senate Proceedings, May 20, 2009, at 111-12 (statements of Senator Cullerton).

¶ 44     Senator Risinger stated:

"It's not a perfect bill that we're going to be looking at, but certainly it's one that we've worked together and–and made happen. There's–the revenue that we're going to talk about to fund this, if any one of us was going to put this together, we would probably put it together a little different way. But there's things in it that we like and maybe things that we don't like. *** And we're going to be able to address the real needs of our infrastructure that has been suffering for such a long period of time." 96th Ill. Gen. Assem., Senate Proceedings, May 20, 2009, at 112-13 (statements of Senator Risinger).

¶ 45     Senator Dillard stated:

"Over here we're not necessarily happy with all of the revenue sources that are in here. *** I view capital as very different in terms of raising new revenues than I do the operations of State government. And I have always supported every capital bill that's ever been put out here. There is one component of this particular package that I really have trouble with. And that is the video poker side of things ***. *** But most importantly, I think, like many of you, I have committed to my local chambers of commerce, my local labor unions, my local newspapers, that I would support a major capital bill. And I intend to do that today. This State is literally falling apart." 96th Ill. Gen. Assem., Senate Proceedings, May 20, 2009, at 115-16 (statements of Senator Dillard).

¶ 46     Representative Cross stated:

"I think it's important to point out that this Bill happened because a lot of people talked and a lot of people worked together. And it's called compromise; it's called building consensus. I don't like all of the revenue streams. I'm troubled by some of them, but the reality is we would not have passed any capital Bill without some revenue stream causing us some angst." 96th Ill. Gen. Assem., House Proceedings,

May 21, 2009, at 142 (statements of Representative Cross).

¶ 47    The legislative debate demonstrates that the legislators engaged in a detailed discussion of many of the provisions in the bill. There is no evidence that any obviously unrelated provisions were "tacked on" to the bill at a later time. Overall, the debate shows that the legislators were aware that they were voting on sources of funding for capital improvements to the state. By contrast, in *Olender*, where this court struck down a bill because of logrolling, the debate revealed that legislators referred to the bill as "a short title, not *** a good piece of legislation," and "a flawed, omnibus bill." *Olender*, 222 Ill. 2d at 142-43. One Representative complained that there was no in-depth discussion of other, unrelated issues which were "tacked onto" the bill. *Id*. at 143.

¶ 48    In the debate on Public Act 96–34, although a few legislators remarked that they disliked some of the revenue sources, particularly video gaming, they also commented that the bill was reached through compromise and with the goals of putting people back to work and improving the state's infrastructure. We interpret these remarks as legitimate compromise on a bill which comprised a single subject. Indeed, there is a difference between impermissible logrolling and the normal compromise which is inherent in the legislative process. See *Defenders of Wildlife v. Ventura*, 632 N.W.2d 707, 713-15 (Minn. Ct. App. 2001). A diverse and complex enactment such as Public Act 96–34 is likely to result from compromise and negotiation among the members of the General Assembly. The presence of such legislative compromise does not mean that the Act violates the single subject rule. Public Act 96–34 is a constitutionally legitimate enactment genuinely encompassing one subject. Accordingly, we reverse the judgment of the appellate court holding Public Act 96–34 unconstitutional.

¶ 49                                    B. *Public Act 96–37*

¶ 50    In count I of their complaint, plaintiffs also contend that Public Act 96–37, entitled "An Act concerning government," violates the single subject rule. Pub. Act 96–37 (eff. July 13, 2009). The official short title of the Act is the "FY2010 Budget Implementation (Capital) Act," and its stated purpose is "to make changes in state programs that are necessary to implement the Governor's Fiscal Year 2010 budget recommendations concerning capital." *Id.* Among other things, Public Act 96–37 authorizes grants and expenditures to not-for-profit hospitals, health centers, libraries, parks, and colleges; makes changes to the lottery provisions in Public Act 96–34, including those pertaining to the private manager of the lottery; makes changes to the central communications system for video gaming and adds a severability provision to the Video Gaming Act; adds felony offenses for violations of the Video Gaming Act; clarifies that increased taxes created under Public Act 96–34 will be deposited into the Capital Projects Fund while existing taxes will continue to be deposited into the General Revenue Fund; requires financial disclosures in car rental contracts; certifies a pilot river edge redevelopment zone in Elgin; amends provisions of the General Obligations Bond Act; implements an urban weatherization program; provides for pension benefits to the Illinois Gaming Board; and adds Illinois Gaming Board peace officers.

¶ 51    During the Senate debate for House Bill 2424, Senator Trotter described the bill as

follows:

> "As amended, House Bill 2424 creates various Acts and amends other Acts in order to implement the capital budget. Specifically, it adds language to implement funding for safety net hospitals, downstate hospitals, community health facilities, public libraries, parks, private colleges, school construction. It also amends the Video Gaming Act to provide further safeguards against the potential abuse of the Act. It amends the Illinois Lottery Law to address the transition to the selection of a private manager, the manager's use of the current department's employee services. It requires private managers to hire Lottery employees. And, again, there's many issues and–many Acts that are amended." 96th Ill. Gen. Assem., Senate Proceedings, May 31, 2009, at 169-70 (statements of Senator Trotter).

¶ 52    Plaintiffs contend that Public Act 96–37 "creates entirely new acts, launches wholly new programs, and initiates laws that have nothing to do with implementation of the State budget." However, there is no authority to support the proposition that a budget implementation bill may only makes changes to existing programs and may not create new programs. After much consideration, we find that all of the provisions in Public Act 96–37 bear a natural and logical connection to the single subject of implementation of the state's capital budget.

¶ 53    In support of their single subject claim, plaintiffs point to only one specific provision which they argue is not relevant to the implementation of the state budget. That provision allows car rental companies to include a separately stated mandatory surcharge in car rental agreements to recover increased costs for vehicle licenses. Pub. Act 96–37 (eff. July 13, 2009) (amending 625 ILCS 5/6–305.3 (West 2008)). Contrary to plaintiffs' argument, we find the car rental fee provision to be directly related to the increased vehicle registration fees imposed by Public Act 96–34, and thus related to the legislative purpose of implementing the state's capital budget. "In enacting a bill, the legislature may provide the means necessary to accomplish the legislative purpose." *Cutinello v. Whitley*, 161 Ill. 2d 409, 424 (1994). Moreover, as with Public Act 96–34, there is no evidence in the legislative debates of obstruction of an informed discussion of the provisions in the bill. Accordingly, we find no single subject violation in Public Act 96–37.

¶ 54                    C. *Public Act 96–38*

¶ 55    Public Act 96–38, entitled "An Act concerning government," changes various provisions in Public Act 96–34, including the effective date of some of the tax increases. Public Act 96–38 also amends and adds several provisions to the Video Gaming Act, enacted as part of Public Act 96–34. Specifically, Public Act 96–38 modifies residency requirements for licenses under the Video Gaming Act; sets forth licensing requirements for operators of video gaming terminals and adds criminal penalties; and sets forth various other rules and restrictions concerning the Video Gaming Act. During the debate in the House, Representatives referred to the bill as a "clean-up Bill for the revenue portion" of the capital program, in order to "make[ ] those revenues and the streams that were placed in [Public Act 96–34] work better for the Department of Revenue and the retailers who will have to

implement them *** and the Secretary of State." 96th Ill. Gen. Assem., House Proceedings, June 30, 2009, at 39-40 (statements of Representatives Eddy and Mautino). During the debate in the Senate, Senator Sullivan described the bill as follows:

> "Senate Bill 349 amends the Video Gaming Act to provide further safeguards against potential abuses of the Act. It also amends the Liquor Control Act to increase the tax rate for alcoholic cider beverages. These are recommendations of the Department of Revenue with regard to the capital bill that recently passed. *** I will say that this actually tightens up and further restricts and puts additional safeguards into the previous passed legislation." 96th Ill. Gen. Assem., Senate Proceedings, June 30, 2009, at 44-45 (statements of Senator Sullivan).

¶ 56     Plaintiffs allege in count I of their complaint that Public Act 96–38 violates the single subject rule because two of the provisions in the act relate to neither revenue nor capital projects. According to plaintiffs, the amendment to the Video Gaming Act providing that licensed terminal operators and licensed establishments must split the profits of video gaming 50/50 "notwithstanding any agreement to the contrary" only affects the private parties who stand to benefit from video gaming. Plaintiffs also argue that the provision changing the residency requirement for video gaming licensing is unrelated to the subject of revenue or capital projects.

¶ 57     As with Public Act 96–37, we find no violation of the single subject rule in Public Act 96–38. All of the Act's provisions relate to capital projects. The subject of capital projects properly encompasses financing for the projects authorized by the legislation. Having created the Video Gaming Act in Public Act 96–34, it was permissible for the legislature to enact a separate bill relating to aspects of video gaming which remained unaddressed by the previous bill. Accordingly, we affirm the judgment of the circuit court with respect to count I of plaintiffs' complaint.

¶ 58                    D. *Contingency Provisions*

¶ 59     Plaintiffs allege in count V of their complaint that the contingency provisions in Public Acts 96–34, 96–35, 96–37, and 96–38 violate the single subject clause. Section 9999 of Public Act 96–34 states that "this Act does not take effect at all unless House Bill 312 of the 96th General Assembly [Public Act 96–35], as amended, becomes law." Public Act 96–35, the enactment dealing with appropriations, states that it "does not take effect at all unless House Bill 255 of the 96th General Assembly [Public Act 96–34], as amended, becomes law." Both Public Act 96–37 and Public Act 96–38 include provisions stating that various parts of those acts will take effect "[i]f and only if House Bill 255 of the 96th General Assembly [Public Act 96–34] becomes law." Plaintiffs allege that the contingency provisions in all four bills essentially transform them into "one bill," thereby violating the single subject rule and rendering the acts unconstitutional.

¶ 60     We find no constitutional infirmity in any of the contingency clauses challenged by plaintiffs. In Illinois, the General Assembly may lawfully enact a statute, the operation of which is dependent upon a contingent event. *City of Chicago v. Central National Bank in Chicago*, 5 Ill. 2d 164, 172 (1955); *Zisook v. Maryland-Drexel Neighborhood*

-12-

*Redevelopment Corp.*, 3 Ill. 2d 570, 581 (1954); *People ex rel. Thomson v. Barnett*, 344 Ill. 62, 72 (1931); *Home Insurance Co. v. Swigert*, 104 Ill. 653 (1882). Whether the enactment of a statute may be contingent on the enactment of another statute is an issue of first impression in Illinois. However, nothing in our constitution prohibits making a piece of legislation contingent on a separate legislative enactment.

¶ 61        Courts in other jurisdictions have upheld the legislature's authority to declare that an act becomes effective only upon the enactment of a separate act. See *In re R.W.*, 588 So. 2d 499, 500 (Ala. Civ. App. 1991); *People v. Sterling Refining Co.*, 261 P. 1080, 1085 (Cal. Dist. Ct. App. 1927); *In re Advisory Opinion to the Governor*, 239 So. 2d 1, 9 (Fla. 1970); *Shehane v. Wimbish*, 131 S.E. 104, 105 (Ga. Ct. App. 1925); *State v. Reado*, 295 So. 2d 440, 444 (La. 1974); *State ex rel. De Woody v. Bixler*, 25 N.E.2d 341, 344 (Ohio 1940); *Marr v. Fisher*, 187 P.2d 966, 969-70 (Or. 1947); *Johnson v. State*, 60 P.2d 681, 682 (Wash. 1936). The only restriction which has been imposed on the practice of tying together two statutes in this manner is that there be a reasonable relationship between the statutes:

> "Appropriations may constitutionally be made contingent upon matters or events reasonably related to the subject of the appropriation, but may not be made to depend upon entirely unrelated events. For example, an appropriation to a university might be contingent upon the registration of a minimum number of students who could benefit from the appropriation or contingent upon the state revenues reaching a certain level. There is no constitutional impediment to an appropriation being made contingent upon another bill, reasonably related to the appropriation and where there is a direct and relative interdependence between them, becoming law." *In re Advisory Opinion to the Governor*, 239 So. 2d at 9.

¶ 62        The public acts in the instant case clearly are reasonably related to one another in that they are associated with raising funds for capital projects, establishing capital projects, and appropriating funds to those projects. In light of that relationship, we hold that the contingency provisions in the acts do not violate the single subject rule. Each bill was separately enacted, in accordance with the Illinois Constitution; therefore, we cannot say that the contingency provisions transformed the acts into a single act for purposes of the single subject rule. Nor do the contingency provisions represent improper logrolling, as plaintiffs contend. The practicalities of implementing a large and complex capital projects program, while complying with constitutional guidelines, necessitated that the legislature separate the various parts of the program into separate bills. At the same time, it makes little sense to raise taxes to fund capital programs without appropriating the money toward those programs, and vice versa. The Supreme Court of Florida recognized this interrelationship when it upheld three tax statutes which were made contingent upon the enactment of each of the other acts. The court explained:

> "[The Florida Revenue Act of 1949] is a law which embraces but one subject and matters properly connected therewith. The fact that it is an act which was passed as part and parcel of a comprehensive tax program devised by the legislature in the exercise of its law-making power, makes it none the less a single law within the purview of [the single subject rule]***. *** A legislative program of such magnitude may necessarily involve several subjects before the ultimate end effect can be

accomplished. It was essential, therefore, in enacting its program that the legislature provide a separate law for each subject with which it dealt. It had no alternative and it cannot be said that it violated [the single subject rule] for actually it complied meticulously with the requirements of that constitutional provision." *Gaulden v. Kirk*, 47 So. 2d 567, 575 (Fla. 1950).

¶ 63    We agree with this reasoning and hold that the contingency provisions in the acts do not violate the single subject rule. We therefore affirm the judgment of the circuit court with respect to count V of plaintiffs' complaint.

¶ 64    We note that the appellate court below held that the contingency provisions in Public Acts 96–35, 96–37, and 96–38 render the acts invalid. That holding was not based on the constitutionality of those acts, however, but on the court's conclusion that Public Act 96–34 violated the single subject rule and was, therefore, void in its entirety. Under the appellate court's reasoning, the remaining public acts, which were contingent on the enactment of Public Act 96–34, could not stand. Because we find no violation of the single subject rule in any of the challenged acts, the other acts are not invalid on this basis.

¶ 65                II. Presentment Clause, Effective-Date-of-Laws Clause,
                        Veto Procedures, Separation of Powers

¶ 66    In count VI of their complaint, plaintiffs further allege that the provisions tying together Public Acts 96–34 and 96–35 violate the presentment clause (Ill. Const. 1970, art. IV, § 9(a)), the effective-date-of-laws clause (Ill. Const. 1970, art. IV, § 10), veto procedures (Ill. Const. 1970, art. IV, §§ 9(b), (d), (e)), and the separation of powers doctrine (Ill. Const. 1970, art. II, § 1). Plaintiffs' contentions are unavailing.

¶ 67    The presentment clause states: "Every bill passed by the General Assembly shall be presented to the Governor within 30 calendar days after its passage. The foregoing requirement shall be judicially enforceable. If the Governor approves the bill, he shall sign it and it shall become law." Ill. Const. 1970, art. IV, § 9(a). Plaintiffs argue that the presentment clause contemplates a single bill rather than a group of bills, and that a bill must become effective upon being signed by the Governor. Plaintiffs' argument is unpersuasive. The presentment clause does not mandate that, once the bill is signed by the Governor, the bill must take effect immediately. It simply states that the bill "shall become law." The General Assembly has the authority to direct the date upon which an act shall take effect. *People ex rel. Thomson v. Barnett*, 344 Ill. 62, 72 (1931). The bills in the instant case do not violate the presentment clause.

¶ 68    Plaintiffs' argument regarding the effective-date-of-laws clause also fails. The effective-date-of-laws clause states:

    "The General Assembly shall provide by law for a uniform effective date for laws passed prior to June 1 of a calendar year. The General Assembly may provide for a different effective date in any law passed prior to June 1. A bill passed after May 31 shall not become effective prior to June 1 of the next calendar year unless the General Assembly by the vote of three-fifths of the members elected to each house provides for an earlier effective date." Ill. Const. 1970, art. IV, § 10.

¶ 69      Plaintiffs contend that, when the constitution states that a bill passed under certain circumstances shall take effect on a certain date, the legislature cannot change the date absent passage, presentment, and enactment of a subsequent bill.

¶ 70      We find no violation of the effective-date-of-laws clause. Both Public Act 96–34 and 96–35 were passed by more than three-fifths of the members elected to each house and thus fit within the exception in the effective-date-of-laws clause. Both bills took effect immediately upon becoming law on July 13, 2009.

¶ 71      Finally, plaintiffs argue that the contingency provisions negate the Governor's ability to veto laws, in violation of the veto procedures established in the constitution (Ill. Const. 1970, art. IV, §§ 9(b), (d), (e)), and the separation of powers doctrine (Ill. Const. 1970, art. II, § 1). They argue that tying the legislation together in this manner represents an unconstitutional effort by the legislative branch to control or deprive the executive branch of its veto powers.

¶ 72      We reiterate that each of the bills at issue was enacted separately and that the tying provisions did not transform the bills into a single bill. Therefore, the Governor was not prohibited from using his veto powers in accordance with the Constitution. We also recognize the practical need for the legislature to separate the various parts of the capital program into separate bills while also tying the revenue sources together with their corresponding appropriations. See also *In re Advisory Opinion to the Governor*, 239 So. 2d 1, 9-10 (Fla. 1970) (finding that the legislature did not interfere with the governor's veto power where it made an appropriation bill contingent upon another reasonably related bill). Accordingly, we hold that the tying provisions in Public Acts 96–34 and 96–35 did not violate the separation of powers doctrine or run afoul of constitutional veto procedures. We therefore affirm the judgment of the circuit court with respect to count VI of plaintiffs' complaint.

¶ 73                          III. Public Funds Clause

¶ 74      In count II of their complaint, plaintiffs allege that the video gaming and lottery private manager provisions in Public Acts 96–34, 96–37, and 96–38 violate article VIII, section 1(a), of the Illinois Constitution of 1970 (the public funds clause): "Public funds, property or credit shall be used only for public purposes." Ill. Const. 1970, art. VIII, § 1(a).

¶ 75      Article 5 of Public Act 96–34 creates the Video Gaming Act, which allows certain licensed establishments to conduct video gaming and imposes a 30% tax on all net income from video gaming terminals. Pub. Act 96–34 (eff. July 13, 2009); see also Pub. Acts 96–37, 96–38 (eff. July 13, 2009) (amending the Video Gaming Act). The amendments to the Illinois Lottery Law in article 900, section 900, of Public Act 96–34, and article 60, section 60–10, of Public Act 96–37 provide, in part, that the Department of Revenue "shall conduct the lottery with the assistance of a private manager under a management agreement at all times in a manner consistent with [federal law]." Pub. Acts 96–34, 96–37 (eff. July 13, 2009) (amending 20 ILCS 1605/2 (West 2008)). According to plaintiffs, these provisions violate federal laws criminalizing the promotion and advertisement of lotteries in interstate commerce. 18 U.S.C. §§ 1301 through 1304, 1953(a) (2000). Plaintiffs then argue, with no citation to authority, that "because the programs constitute illegal gambling under federal

law, expending State funds to establish them violates the Constitution's command that public funds be used only for public purposes." We disagree.

¶ 76     Plaintiffs' premise that the programs are illegal is questionable. First, video gaming does not appear to fit within the definition of a "lottery" under federal law, which means the Video Gaming Act is not subject to the federal criminal gambling laws relied on by plaintiffs. See 18 U.S.C. §§ 1307(d), 1953(e). Secondly, from our review of the legislation, it appears that the amendments to the Illinois Lottery Law in Public Acts 96–34 and 96–37 were drafted with the goal of conforming with the federal guidelines for lotteries conducted by a state acting under the authority of state law. See 18 U.S.C. §§ 1307(a)(1), (b)(1), 1953(b)(4); see also Scope of Exemption Under Federal Lottery Statutes for Lotteries Conducted by a State Acting Under the Authority of State Law, Op. O.L.C. (Oct. 16, 2008), http://www.justice.gov/olc/2008/state-conducted-lotteries101608.pdf.

¶ 77     In any event, even if plaintiffs are correct that the video gaming and lottery private manager provisions violate federal criminal law, it does not follow that these provisions violate the public funds clause in the constitution. Whether an enactment complies with federal law is not the test for deciding whether the enactment runs afoul of the public funds clause.

¶ 78     The principles regarding a public purpose under article VIII, section 1(a), are well settled. To establish that a statute is unconstitutional, " 'facts must be alleged indicating that governmental action has been taken which directly benefits a private interest without a corresponding public benefit.' " *Empress Casino Joliet Corp. v. Giannoulias*, 231 Ill. 2d 62, 85 (2008) (quoting *Paschen v. Village of Winnetka*, 73 Ill. App. 3d 1023, 1028-29 (1979)). "This court has long recognized that what is for the public good and what are public purposes are questions which the legislature must in the first instance decide." *In re Marriage of Lappe*, 176 Ill. 2d 414, 429-30 (1997) (citing *People ex rel. City of Salem v. McMackin*, 53 Ill. 2d 347, 355 (1972), and *Cremer v. Peoria Housing Authority*, 399 Ill. 579, 588 (1948)). "In making this determination, the legislature is vested with a broad discretion, and the judgment of the legislature is to be accepted in the absence of a clear showing that the purported Public purpose is but an evasion and that the purpose is, in fact, private." *Id*. at 430 (citing *Salem*, 53 Ill. 2d at 355, *People ex rel. McDavid v. Barrett*, 370 Ill. 478, 482 (1939), and *Hagler v. Small*, 307 Ill. 460, 474 (1923)).

¶ 79     "This court has recognized that '[t]he execution of a public purpose which involves the expenditure of money is usually attended with private benefits.' " *Id.* at 436-37 (quoting *Hagler*, 307 Ill. at 473). "If the principal purpose of the enactment is public in nature, it is irrelevant that there will be an incidental benefit to private interests." *Id.* at 437 (citing *Salem*, 53 Ill. 2d at 355, and *People ex rel. Adamowski v. Chicago R.R. Terminal Authority*, 14 Ill. 2d 230, 236 (1958)).

¶ 80     Plaintiffs do not allege that either the video gaming or lottery manager provisions benefit a private interest without a corresponding public benefit, or that the legislature's stated purpose for the enactments is an evasion and that the purpose is, in fact, private. The purpose of the Video Gaming Act is to increase revenue to the state, undoubtedly a public purpose. With regard to the lottery provisions, although the private manager of the lottery may receive

up to 5% of lottery profits as compensation (Pub. Act 96–37 (eff. July 13, 2009) (amending 20 ILCS 1605/9.1 (West 2008)), this does not negate the public purpose of the provisions. Where an enactment authorizes the expenditure of public funds pursuant to a public purpose, an "incidental benefit to private interests" does not cause the enactment to be unconstitutional. See *Lappe*, 176 Ill. 2d at 437. We find no violation of the public funds clause. Accordingly, we affirm the judgment of the circuit court with respect to count II of plaintiffs' complaint.

¶ 81                                    IV. Uniformity Clause

¶ 82        Article IX, section 2, of the Illinois Constitution (the uniformity clause), provides:

> "In any law classifying the subjects or objects of non-property taxes or fees, the classes shall be reasonable and the subjects and objects within each class shall be taxed uniformly." Ill. Const. 1970, art. IX, § 2.

The uniformity clause is a "specific limitation on the General Assembly in the exercise of its taxing power." *Searle Pharmaceuticals, Inc. v. Department of Revenue*, 117 Ill. 2d 454, 466-67 (1987). The clause requires that a tax classification be based on a real and substantial difference between the persons taxed and those not taxed, and bear some reasonable relationship to the object of the legislation or to public policy. *Arangold Corp. v. Zehnder*, 204 Ill. 2d 142, 153 (2003).

¶ 83        A taxpayer raising a uniformity challenge "is not required to prove that every conceivable explanation for the tax is unreasonable. Rather, the taxing body must 'produce a justification for its classifications.' " *Id.* at 156 (quoting *Geja's Cafe v. Metropolitan Pier & Exposition Authority*, 153 Ill. 2d 239, 248 (1992)). This does not mean, however, that the taxing body has an evidentiary burden or is required to produce facts to justify the classification. *Arangold*, 204 Ill. 2d at 156. The court's inquiry regarding the proffered justification is narrow, and "[i]f a set of facts 'can be reasonably conceived that would sustain it, the classification must be upheld.' " *Empress Casino Joliet Corp. v. Giannoulias*, 231 Ill. 2d 62, 73 (2008) (quoting *Geja's Cafe*, 153 Ill. 2d at 248). Once the taxing body has offered a justification for the classification, the plaintiff then has the burden to persuade the court that the defendant's explanation is insufficient as a matter of law or unsupported by the facts. *Arangold*, 204 Ill. 2d at 156; *Sun Life Assurance Co. of Canada v. Manna*, 227 Ill. 2d 128, 136-37 (2007).

¶ 84        Article 900, section 945, of Public Act 96–34 amends section 8–1 of the Liquor Control Act of 1934 (235 ILCS 5/8–1 (West 2008)) to impose a tax increase on distributors of beer, wine and spirits. In addition to previously existing taxes, the provision adds a new tax of 4.6 cents per gallon on distributors of beer, 66 cents per gallon on distributors of wine, and $4.05 per gallon on distributors of spirits. In count III of their complaint, plaintiffs contend that there is "no expressed or sustainable rationale whatsoever for the huge difference in the gallonage taxes as between the categories of beer, wine and spirits" and, therefore, the tax increases in article 900, section 945, violate the uniformity clause. We disagree.

¶ 85        Plaintiffs acknowledge that the percentage of alcohol is higher by volume in wine than in beer, and higher in spirits than in both beer and wine. It is well established that higher

taxes may be constitutionally imposed on alcoholic beverages that have a higher alcohol content, based on the rationale that beverages with a higher alcohol content contribute to various societal ills and higher taxes on those beverages promotes temperance. See *Timm v. Harrison*, 109 Ill. 593, 600-01 (1884) (holding, under the constitution of 1870, that "[t]he line of division into classes here made, based upon the sale of malt liquors as distinguished from more intoxicating drinks, if viewed as for taxation, is a quite natural and a reasonable one, and not out of harmony, in our view, with any feature of the constitution in respect of taxation"); *Federated Distributors, Inc. v. Johnson*, 125 Ill. 2d 1, 19-20 (1988) (recognizing the validity of taxing "lower alcohol level products at lower rates"); see also, *e.g.*, *Imaginary Images, Inc. v. Evans*, 612 F.3d 736, 746-47 (4th Cir. 2010); *Horton v. Cook*, 538 S.W.2d 221, 222 (Tex. Civ. App. 1976).

¶ 86     Relying on *Wexler v. Wirtz Corp.*, 211 Ill. 2d 18 (2004), plaintiffs maintain that it cannot be assumed that the taxes in article 900, section 945, which are imposed on liquor distributors, are passed on to either retailers or consumers. Thus, according to plaintiffs, despite the long-standing principle that higher taxes may be imposed on beverages with higher alcohol content, "in the wake of *Wexler*," temperance cannot be a sufficient justification for the tax.

¶ 87     In *Wexler*, this court held that an individual consumer lacked standing to challenge a liquor tax imposed on a distributor of alcoholic beverages. In so holding we noted that, even though evidence showed that the distributor had raised its prices to offset the tax increase, and that cost may have been passed on to consumers, that fact did not change the "legal status of the parties." *Id*. at 27. Even if consumers paid a higher price, they could not legally be considered the payers of the challenged tax because the distributor "was the only entity under a legal obligation to remit the tax to the state, and it was the only entity that actually paid the tax." *Id*. Contrary to plaintiffs' assertions, nothing in *Wexler* precludes the General Assembly from assuming, for purposes of promoting the goal of temperance, that increases in wholesale liquor taxes normally will result in increased prices for retail consumers.

¶ 88     Plaintiffs also contend that the new tax rates in article 900, section 945, are unconstitutional because they do not follow proportionally with the alcohol content in the beverages. That is, according to plaintiffs, if the alcohol content in wine is 2 to 3 times greater by volume than in beer, then the tax must be only 2 to 3 times greater, and if the alcohol content in spirits is 8 times greater than in beer, then that tax must be only 8 times greater. But the uniformity clause does not impose such a strict proportionality requirement. " 'Rather, the uniformity clause was designed to enforce minimum standards of reasonableness and fairness as between groups of taxpayers.' " *Arangold Corp.*, 204 Ill. 2d at 153 (quoting *Geja's Cafe*, 153 Ill. 2d at 252). The tax classifications in article 900, section 945, meet that standard.

¶ 89     Temperance is a legitimate public goal and the classifications established in article 900, section 945, are in furtherance of that goal. Because the legislature's judgment on this subject is not a matter that may be factually refuted (*Empress Casino*, 231 Ill. 2d at 75), plaintiffs' uniformity clause claim was properly rejected by the circuit court as a matter of law. *DeWoskin v. Loew's Chicago Cinema, Inc.*, 306 Ill. App. 3d 504, 523 (1999). Accordingly, we affirm the judgment of the circuit court with respect to count III of plaintiffs' complaint.

¶ 90                     V. Substantive Law in an Appropriation Bill

¶ 91        Article IV, section 8(d), of the 1970 Illinois Constitution states that "Appropriation bills shall be limited to the subject of appropriations" (Ill. Const. 1970, art. IV, § 8(d)). The reason for this limitation has been explained:

> "History tells us that the general appropriation bill presents a special temptation for the attachment of riders. It is a necessary and often popular bill which is certain of passage. If a rider can be attached to it, the rider can be adopted on the merits of the general appropriation bill without having to depend on its own merits for adoption." Millard H. Ruud, *No Law Shall Embrace More Than One Subject*, 42 Minn. L. Rev. 389, 413 (1958).

Primarily because of this concern, "an appropriation bill may not contain substantive law." *Board of Trustees of Community College District No. 508 v. Burris*, 118 Ill. 2d 465, 477-78 (1987); see also *People ex rel. Kirk v. Lindberg*, 59 Ill. 2d 38, 42-43 (1974) (noting that the inclusion of provisions other than appropriations in an appropriation bill may effectively nullify the governor's veto power).

¶ 92        However, although an appropriation bill is limited to the subject of appropriations, this limitation is not applied in a "strict, literal sense." 42 Minn. L. Rev. at 423. An appropriation bill may include conditions that "restrict and qualify" an appropriation and that must be fulfilled before the authorized funds are spent. *Benjamin v. Devon Bank*, 68 Ill. 2d 142, 148 (1977). "[T]he appropriations act is not limited to a bare statement of the amounts appropriated and the purposes or objects of the appropriation. Provisions that are an incidental and necessary regulation of the expenditure of the money appropriated may be included." 42 Minn. L. Rev. at 423.

¶ 93        In count IV of their complaint, plaintiffs maintain that Public Act 96–35, which contains appropriations for capital projects, also contains several provisions that do not merely restrict or qualify an appropriation but, instead, create substantive law in violation of article IV, section 8(d). Before addressing these provisions, we clarify the nature of plaintiffs' argument.

¶ 94        Plaintiffs' challenge to Public Act 96–35 is directed to the Act in its entirety. They assert that the "inclusion of any substantive law authority in [an appropriation] bill invalidates the entire bill." Thus, according to plaintiffs, if any single provision in Public Act 96–35 contains substantive law, then the entire act is invalid and further, because the effectiveness of Public Act 96–34 is contingent upon Public Act 96–35 becoming law, Public Act 96–34 falls as well. The premise of plaintiffs' argument is not correct.

¶ 95        A claim that substantive law is contained in an appropriation bill may be contrasted with a single subject challenge. It is generally held that when an act contains two or more subjects in violation of the single subject rule, the reviewing court cannot choose which subject is the "right" one and eliminate the other. Such a determination would "inject[ ] the courts more deeply than they should be into the legislative process." *Litchfield Elementary School District No. 79 v. Babbitt*, 608 P.2d 792, 804 (Ariz. Ct. App. 1980); *Power, Inc. v. Huntley*, 235 P.2d 173, 178 (Wash. 1951) (when an act embraces two subjects it is impossible for a court to choose between the two). Largely for this reason, a single subject challenge is

directed toward the act as a whole. Because there is no "right" subject that the court can look to, " '[t]here is no one provision or feature of the act that is challenged as unconstitutional, such that the defect could be remedied by a subsequent amendment which simply deleted or altered that provision or feature.' " *People v. Olender*, 222 Ill. 2d 123, 145-46 (2005) (quoting *Johnson v. Edgar*, 176 Ill. 2d 499, 511-12 (1997)); *Litchfield*, 608 P.2d at 804 ("Since the enactment in question is infected by reason of the combination of its various elements rather than by any invalidity of one component, the otherwise salutary principle of severance and partial savings of valid portions does not apply"); *Huntley*, 235 P.2d at 178 (when an act embraces " 'two distinct objects, when the constitution says it shall embrace but one, the whole act must be treated as void' " (quoting 1 Walter Carrington, Cooley's Constitutional Limitations 308 (8th ed. 1927))).

¶ 96    The same is not true with respect to a claim that an appropriation bill contains a substantive law provision. The "right" subject in an appropriation bill is appropriations, as the constitution itself states. Thus, in an appropriation bill, a provision that contains substantive law is " 'one provision or feature' " (*Olender*, 222 Ill. 2d at 146 (quoting *Johnson*, 176 Ill. 2d at 512)) that is constitutionally impermissible, and the appropriate remedy is to strike that provision from the act. See *People ex rel. Kirk v. Lindberg*, 59 Ill. 2d 38, 42 (1974); *Devon Bank*, 68 Ill. 2d 142; see also, *e.g.*, *Department of Education v. Lewis*, 416 So. 2d 455, 463 (Fla. 1982). Only if the substantive provision cannot be severed will the act be struck in its entirety.

¶ 97    With this understanding, we turn to plaintiffs' claims. Article 140, section 99, of Public Act 96–35 states that the Act does not become effective unless Public Act 96–34, as amended, becomes law. Plaintiffs contend this contingency provision effectively incorporates all of Public Act 96–34, with its numerous substantive law provisions, into Public Act 96–35 and, therefore, that these substantive provisions are invalid. We disagree.

¶ 98    Although the effectiveness of Public Act 96–35 is contingent on Public Act 96–34 becoming law, this does not mean that the provisions of Public Act 96–34 are part of Public Act 96–35 within the meaning of the constitutional prohibition against including substantive law. Indeed, as we discussed previously (see section I(D), *supra*), it is permissible to make an appropriation bill contingent upon the passage of other, reasonably related legislation. *In re Advisory Opinion to the Governor*, 239 So. 2d at 9; *Colton v. Branstad*, 372 N.W.2d 184, 189 (Iowa 1985) ("it is well established that appropriations may be made contingent upon matters or events reasonably related to the subject of the appropriation"). Accordingly, we reject plaintiffs' contention that Public Act 96–34 is effectively and improperly incorporated into Public Act 96–35.

¶ 99    Plaintiffs also identify several other provisions that are, in fact, contained within Public Act 96–35 and that, in plaintiffs' view, constitute substantive law. Plaintiffs first point to article 100, section 30, of Public Act 96–35. This provision reappropriates funds from the Build Illinois Bond Fund to the Illinois Environmental Protection Agency for grants for wastewater-compliance programs, and states that "[t]hese grants are limited to projects for which the local government provides at least 30% of the project cost[, t]here is an approved compliance plan, and there is an enforceable compliance schedule prior to grant award." Plaintiffs contend that this provision constitutes substantive law because it adds restrictions

-20-

for wastewater-compliance grants not found in the Illinois Environmental Protection Act itself (415 ILCS 5/4(t) (West 2008)).

¶ 100    Plaintiffs also point to article 61, section 10, and article 5, section 15, of Public Act 96–35. Article 61, section 10, states that, with respect to appropriations to the Illinois Emergency Management Agency for safety and security improvements at higher education facilities "[n]o contract shall be entered into or obligation incurred for any expenditures from appropriations in Section 5 of this Article until after the purposes and amounts have been approved in writing by the Governor." Similarly, article 5, section 15, which reappropriates funds to the Office of the Architect of the Capitol, states that "[n]o contract shall be entered into or obligation incurred for any expenditures from appropriations in Sections 5 and 10 of this Article until after the purposes and amounts have been approved in writing by the Governor." Plaintiffs maintain that both these provisions alter substantive law by requiring the Governor's approval for the expenditures, a requirement not found in the underlying enabling statutes for the Illinois Emergency Management Agency or the Office of the Architect of the Capitol.

¶ 101    Finally, plaintiffs' point to article 50, section 25. This provision states that the "sum of $310,000,000, or so much thereof as may be necessary, is appropriated from the Transportation Bond Series A Fund to the Department of Transportation for [various projects] as approximated below." The provision then lists a dollar amount for 10 geographic districts and a dollar amount for "engineering." Plaintiffs contend that the phrase "as approximated below" impermissibly delegates to the Director of the Department of Transportation the job of appropriating money and, thus, constitutes invalid substantive law.

¶ 102    Defendants, in response, initially contend that plaintiffs' claims regarding the foregoing provisions are moot. We agree. Plaintiffs' complaint is brought pursuant to section 11–303 of the Code of Civil Procedure (735 ILCS 5/11–303 (West 2008)), which permits an "action to restrain and enjoin the disbursement of public funds by any officer or officers of the State government." See 735 ILCS 5/11–301 (West 2008). As defendants point out, the 2009 fiscal year is over, and the appropriation authority created by Public Act 96–35 has lapsed. See *West Side Organization Health Services Corp. v. Thompson*, 79 Ill. 2d 503, 506 (1980). This court cannot enjoin the legislature from appropriating funds pursuant to the provisions cited by plaintiffs because those provisions are no longer in effect. Because this court cannot grant effective relief, plaintiffs' claims regarding the challenged provisions are moot. *Felzak v. Hruby*, 226 Ill. 2d 382, 392 (2007).

¶ 103    Plaintiffs, however, ask us to invoke the public interest exception to the mootness doctrine. The criteria for invoking the public interest exception are: (1) the public nature of the question, (2) the desirability of an authoritative determination for the purpose of guiding public officers, and (3) the likelihood that the question will generally recur. *In re A Minor*, 127 Ill. 2d 247, 257 (1989). We note that the provisions challenged by plaintiffs continue to be employed by the General Assembly in current budget legislation. See 97th Ill. Gen. Assem., Senate Bill 2414, 2011 Sess., article 1, section 20 (Governor's approval for Architect of the Capitol contracts); article 10, section 20 ("approximated below" language); article 13, section 10 (Governor's approval for Emergency Management Agency contracts); article 22, section 35 (restrictions on wastewater-compliance grants). Given this fact and the

clear public nature of the issues presented, as well as the desirability of a resolution of the questions presented, we conclude that the criteria of the public interest exception have been met. See, *e.g.*, *Colton*, 372 N.W.2d at 187.

¶ 104 Turning to the merits, in support of their claim that the restrictions on grants for wastewater-compliance found in article 100, section 30, amount to unconstitutional substantive law, plaintiffs rely primarily on this court's decision in *Benjamin v. Devon Bank*, 68 Ill. 2d 142 (1977). In that case, a statute authorized the Director of the Department of Labor, in his discretion and with the approval of the Governor, to open branch offices outside Springfield. *Id.* at 148. After the Director entered into a lease for an unemployment insurance office located in Chicago, the General Assembly included a provision in an appropriation bill which stated that none of the Department's appropriated funds could be used to open or staff an unemployment insurance office "located within 500 feet of a school in any city with a population over 1,000,000." (Internal quotation marks omitted.) *Id.* at 143. Finding this provision to be unconstitutional substantive law, this court "agree[d] that the General Assembly may restrict and qualify the use to which funds appropriated may be put" but held that, in this case, the contested provision impermissibly "placed an additional limitation on the location of a branch office, and this cannot be done in an appropriation bill." *Id.* at 148.

¶ 105 The statutory provision at issue in *Devon Bank* differs significantly from article 100, section 30. The provision in *Devon Bank* was targeted to a single lease. It was an attempt to overturn an action taken by the executive branch, which was authorized by statute, through the use of a legislative rider. This is the type of unreasonable legislative maneuver the constitutional prohibition on including substantive law is intended to prevent. In contrast, the restrictions in article 100, section 30, are not targeted to any single wastewater project but are applicable to all grants for which money has been appropriated under that provision. Further, there is no indication that the legislature, by including article 100, section 30, was attempting to overturn previous decisions made by the executive branch that were authorized by general laws. We conclude that article 100, section 30, contains reasonable restrictions on an appropriation that do not constitute substantive law.

¶ 106 We similarly find no constitutional problem with article 61, section 10, or article 5, section 15, the provisions which require the Governor's approval before expenditures from the appropriations may be made. Case law recognizes a distinction between appropriations and expenditures, and the prevailing view is that provisions which authorize the executive branch to control the expenditure of the amounts appropriated by the legislature may be included in an appropriation bill. See *State ex rel. Holmes v. State Board of Finance*, 367 P.2d 925, 929-30 (N.M. 1961) (and cases cited therein). We agree and hold that neither article 61, section 10, nor article 5, section 15, contains impermissible substantive law.

¶ 107 Finally, we reject plaintiffs' contention that the phrase "as approximated below" found in article 50, section 25, improperly delegates to the Director of the Department of Transportation the job of appropriating money. In support of their contention, plaintiffs cite this court's decision in *County of Cook v. Ogilvie*, 50 Ill. 2d 379 (1972). In that case, this court held unconstitutional a statute which allowed the Department of Public Aid, with the consent of the Governor, to "reapportion the amounts appropriated in this section among the several subdivisions of distributive expenses herein designated as the need therefor arises."

*Id.* at 384. No such provision allowing reapportionment is found in article 50, section 25.

¶ 108 The "as approximated below" language simply acknowledges the fact that the completion of some of the projects authorized by article 50, section 25, may not require all the funds that have been appropriated. The provision itself makes this clear by stating that the sum of $310,000,000, "or so much thereof as may be necessary," is appropriated for the various projects. We find nothing constitutionally impermissible about the inclusion of the "as approximated below" language.

¶ 109 Because we find no constitutional infirmity with respect to the provisions challenged by plaintiffs, we affirm the judgment of the circuit court with respect to count IV of plaintiffs' complaint.

¶ 110 CONCLUSION

¶ 111 For the foregoing reasons, the judgment of the appellate court is reversed and the judgment of the circuit court is affirmed.

¶ 112 Appellate court judgment reversed;

¶ 113 circuit court judgment affirmed.